**Phillip N. LOCKHART, Charles B. Wilson, James Lowery, James P. Durham and Thomas Bradley**

v.

**WESTINGHOUSE CREDIT CORPORATION,**
**Appellant.**

No. 88–3374.

United States Court of Appeals, Third Circuit.

Argued Dec. 1, 1988.

Decided June 13, 1989.

Rehearing and Rehearing In Banc Denied July 13, 1989.

___

**17.** Brief of Defendant–Appellant Leonid Braz at 35 (Nov. 16, 1988).

Alfred W. Vadnais (argued), John J. Myers, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellant.

Joel S. Sansone (argued), Blair & Sansone, Melvin L. Vatz, Grossinger, Gordon & Vatz, Pittsburgh, Pa., for appellees.

Before HIGGINBOTHAM, MANSMANN and GARTH, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from an action arising under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* (1982) ("ADEA"), and the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* (1982) ("FLSA"). The suit involved multiple plaintiffs, former employees of the appellant-defendant, Westinghouse Credit Corporation ("WCC"), who alleged that they were unlawfully terminated from their jobs because of their ages, and that their terminations were done in willful violation of the ADEA. The jury returned verdicts in favor of two of the plaintiffs, additionally finding that WCC had willfully discriminated against one of them. Upon our review of the record, we find insufficient evidence to support the jury's verdict of willful discrimination. Accordingly, we will vacate that portion of the district court's judgment order awarding liquidated damages.

## I.

In an effort to increase its profitability, WCC decided to undertake a corporate reorganization. In May 1983, WCC engaged McKinsey and Company, Inc. (the "McKinsey Group"), a management consulting firm, to assist in that effort. After the McKinsey Group released its report in January 1984, WCC merged its four corporate divisions—Industrial Equipment Financing, Financial Services, Real Estate Financing and Business Financing—into two larger bodies: Commercial Services and Capital Financing. During the process of restructuring, a number of management positions within WCC were eliminated.

Contemporaneous with WCC's commissioning of the McKinsey Group, Phillip N. Lockhart, who was employed in the Financial Services division as District Manager of WCC's Pittsburgh Office, was terminated from his position on May 3, 1983, ostensibly because of an unfavorable audit of his office. He was 58 years old at the time and had been an employee of WCC's since 1960. On July 21, 1983, Lockhart filed a formal written charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that WCC discriminated against him on the basis of his age because several WCC branches were being consolidated with the Pittsburgh Office, and the resulting new management position was being filled by an employee who was 34 years old and who had less experience than Lockhart. In September 1984, the EEOC informed Lockhart that it would

take no further action on his charge; he then proceeded on his own behalf.

Lockhart commenced this suit on April 11, 1985, claiming that he was discharged from his position with WCC on account of his age, in violation of § 4(a)(1) of the ADEA,[1] 29 U.S.C. § 623(a)(1), and § 16(b) of the FLSA,[2] 29 U.S.C. § 216(b). On December 6, 1985, Lockhart filed a motion to join additional parties pursuant to the opt-in class action provision in § 16(b) of the FLSA. The motion sought to add James Durham,[3] Charles Wilson, Thomas Bradley and James Lowery on the basis that they were "similarly situated" to Lockhart, in that each one was "terminated from his employment because of his age." Appellant's Appendix ("App.") at 14–15. The district court granted the motion without prejudice to WCC's right to challenge the joinder upon completion of discovery. The amended complaint alleged that WCC's terminations were part of a plan, pattern or practice of unlawful age discrimination in which WCC conspired and willfully terminated each plaintiff.

At the close of discovery, WCC moved for summary judgment against Wilson, Bradley and Lowery on the basis that since they had failed to file charges with the EEOC, and since Lockhart's charge did not allege class-based discrimination, they could not opt into the suit under § 16(b).[4] The district court granted the motion as to Lowery, concluding that if he had sought to file his own charge, it would have been

---

1. The section provides that
 [i]t shall be unlawful for an employer to fail ... to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age.
 29 U.S.C. § 623(a)(1) (1982).

2. The section reads, in pertinent part, that
 [a]n action to recover [for damages resulting from age discrimination] may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.
 29 U.S.C. § 216(b) (1982).

3. Durham was terminated on February 17, 1984 from his position in WCC's Financial Services division as Regional Administrative Manager in Atlanta, Georgia. He was 50 years old at the time and had been employed by WCC since 1960. In the spring of 1984, Durham filed a formal written charge of discrimination with the EEOC. On October 4, 1984, the EEOC notified him that it would take no further action on his charge; Durham then proceeded to join in Lockhart's suit.

4. WCC did not challenge Durham's right to join in Lockhart's suit since he had independently fulfilled the administrative requirement of filing his own timely charge of discrimination with the EEOC.

time-barred by the time Lockhart filed his charge with the EEOC.[5]

The cases of the four remaining plaintiffs proceeded to trial. Answering special interrogatories, the jury returned a verdict as to liability and found that WCC had violated the ADEA in discharging Lockhart and Durham, and that WCC had not violated the ADEA in discharging Wilson and Bradley. The jury further found that WCC's termination of Durham was in willful violation of the ADEA. By agreement of the parties, the issue of damages was submitted to the trial court. Based on the stipulation of the parties as to backpay damages, the court awarded $197,885.83 in backpay to Lockhart and $102,381.69 in backpay to Durham. The court then determined that Lockhart was entitled to $96,000 in frontpay, and that Durham was entitled to $43,000 in frontpay. Moreover, with respect to the jury's finding of willfulness, the court awarded Durham $102,381.69 in liquidated damages, equalling his award of backpay as prescribed by statute. See 29 U.S.C. § 626(b) (1982). In total, the court awarded $293,885.83 to Lockhart and $247,763.38 to Durham, plus their attorneys' fees and costs.

WCC subsequently moved for judgment notwithstanding the verdict with respect to the claims of Durham and Lockhart on the basis of insufficiency of evidence. In the alternative, WCC moved for a new trial based on various alleged pre-trial and trial errors. The district court denied these motions and this appeal followed.

## II.

### A.

WCC's first contention on this appeal is that the evidence proffered at trial was insufficient to support the findings of age discrimination and, therefore, that the district court erred by denying its motion for judgment n.o.v. with respect to the jury's verdicts in favor of Lockhart and Durham. In reviewing the court's denial of WCC's motion, "we must determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." Anastasio v. Schering Corp., 838 F.2d 701, 705 (3d Cir.1988).

The ADEA protects individuals who are 40 and older from employment discrimination based upon their age. See 29 U.S.C. § 631(a) (Supp. IV 1986). Under the ADEA, the plaintiff has the ultimate burden of proving that age was the determinative factor in his or her discharge from employment. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Age need not be the sole factor, but it must have "made a difference in the [employer's] decision." Id. The plaintiff can prevail on his or her claim by proffering direct evidence of specific intent to discriminate, but there is usually no "smoking gun" evidence of intentional discrimination. See Gavalik v. Continental Can Co., 812 F.2d 834, 852–53 (3d Cir.), cert. denied, —— U.S. ——, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

Consequently, the Supreme Court has developed a method of indirect proof involving presumptions and shifting burdens of production in order that the "plaintiff [can have] his [or her] day in court despite the unavailability of direct evidence." Loeb v. Textron, Inc., 600 F.2d 1003, 1014 (1st Cir. 1979). This three-part formula was first articulated in McDonnell–Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and enunciated again in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).[6]

---

5. In its motion for summary judgment, WCC also asserted that the additional plaintiffs were not "similarly situated" to Lockhart within the meaning of § 16(b), and that Lockhart, Wilson and Bradley could not, based on the undisputed facts, prove that WCC's justification for their discharge was pretextual. The district court was not persuaded by either of these contentions.

6. The McDonnell–Douglas test was originally designed for proving employment discrimination based upon race in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982). The standard was later

First, the plaintiff must present a *prima facie* case of age discrimination. This is accomplished "by proving by a preponderance of the evidence that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was dismissed despite being qualified; and (4) he ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Chipollini*, 814 F.2d at 897. The establishment of the *prima facie* case creates a presumption of unlawful discrimination. The burden then shifts to the defendant to come forth with a legitimate non-discriminatory reason for the plaintiff's discharge in order to rebut the presumption. If the defendant is successful, the plaintiff must then prove by a preponderance of the evidence that the defendant's purported justification for his dismissal is not credible.[7]

In the present action, each plaintiff established his *prima facie* showing[8] of age discrimination and WCC presented legitimate, nondiscriminatory reasons for his termination. Each plaintiff then had the burden of proving that WCC's rationale for his discharge was pretextual. WCC argues that neither Lockhart nor Durham proffered any direct evidence to discredit WCC's asserted justifications for their discharge. We have noted, however, that under *McDonnell–Douglas*, direct evidence of discriminatory intent is not necessary. "[A] plaintiff can prevail by means of indirect proof that the employer's reasons are pretextual without presenting evidence specifically relating to age." *Chipollini*, 814 F.2d at 898. We now address whether there is sufficient indirect evidence on the record to support the jury's verdicts in favor of Lockhart and Durham.

### 1. *Lockhart*

Lockhart testified that prior to his termination, he had been with WCC for 22 years, and in each year he had received a merit salary increase and satisfactory performance evaluations. He further testified that he had never received a demotion or salary decrease, and had never received a reprimand. WCC's proffered explanation for Lockhart's discharge was that certain discrepancies were found in the annual audit of his office. In rebuttal, Lockhart explained why each alleged discrepancy did not constitute any wrongdoing. He also explained that he was not given adequate time to answer the charges made against him in this audit, as was the customary procedure, before being fired.

In defense of its actions, WCC called Lockhart's former immediate supervisor, Robert Nazworth, to testify. But on cross-examination Nazworth conceded that he

---

extended by this Court and other Courts of Appeals to cover claims brought under the ADEA. *See Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.1983); *Douglas v. Anderson*, 656 F.2d 528, 531–32 (9th Cir.1981); *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979); *Schwager v. Sun Oil Co. of Pa.*, 591 F.2d 58, 60 (10th Cir.1979); *Rodriguez v. Taylor*, 569 F.2d 1231, 1239 (3d Cir.1977).

**7.** We note that the Supreme Court's recent pronouncement in *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), does not apply to the facts of the case at bar. *Price Waterhouse* involved a Title VII case where an employer used both gender discriminatory and legitimate business concerns in reaching its decision to bypass a female employee for partnership. The Court held that under such a "mixed motive" case, "the [employer] may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not allowed gender to play such a role." —— U.S. at ——, 109 S.Ct. at 1795. In contrast, in the present Title VII action, "the issue is

whether either illegal or legal motives, but not both, were the 'true' motives behind the decision." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400 n. 5, 103 S.Ct. 2469, 2473 n. 5, 76 L.Ed.2d 667 (1983). Under these circumstances, *McDonnell Douglas* and *Burdine* command that the plaintiff prove by a preponderance of the evidence that the employer's purported nondiscriminatory reason for its decision is pretextual.

**8.** WCC also challenges the district court's denial of its motion for a directed verdict against Durham on grounds that he failed to established a *prima facie* case of age discrimination. "[T]he issue of whether plaintiff[s] established a prima facie case is subsumed on appeal into whether the plaintiff has sustained his or her ultimate burden of proving that age was a determinative factor in the plaintiff's termination." *Dreyer v. Arco Chemical Co., Div. of Atl. Richfield Co.*, 801 F.2d 651, 654 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987).

considered Lockhart to have been a good and dependable worker; that confusion on his part may have contributed to some of the charges against Lockhart; and that WCC had a policy of "progressive discipline" whereby any employee would receive various stages of reprimand before being dismissed. WCC also called Benjamin Russell, the second person responsible for Lockhart's termination, to testify. On cross-examination, Russell conceded that Lockhart had never been insubordinate and had never deliberately violated company policy. Notwithstanding Lockhart's reputation, Russell testified that he did not request that Nazworth conduct an investigation into the audit's allegations against Lockhart, and that he did not believe that Lockhart, after 22 years with WCC, deserved a second chance.

On the basis of our review of the record, we conclude that Lockhart's proffered evidence was sufficient to provide a rational basis for the jury's conclusion that WCC's purported justification was not credible and, therefore, that age was the determinative factor in Lockhart's discharge.[9]

### 2. *Durham*

■ Durham, at age 50, was terminated on February 17, 1984, from his position as Regional Administrative Manager in Atlanta, Georgia. He had been employed by WCC since 1960; had received various promotions throughout his tenure; and had received merit salary increases and satisfactory performance evaluations in each year with the company.

The legitimate, non-discriminatory reason given by WCC for terminating Durham was that it had to reduce its working force

because of corporate reorganization. Albert Rowe, who at the time of the reorganization was WCC's Eastern Zone Manager, testified that in January 1984, Durham's former position, Regional Administrative Manager, was combined with that of Regional Manager to form the consolidated position of Regional Operations Manager. Durham allegedly competed with Robert Johnson, a person similar in experience and age, to be Operations Manager. WCC avers that since Johnson received the new position, this fact negates any possible inference that age was the determinative factor in Durham's discharge.

Durham testified, however, that in June 1983, he was informed by James Hyche, former Regional Manager, that he was to have the newly created position of Atlanta Area Business Center Manager. Durham also testified that in August 1983, he assumed the responsibilities of this new position while continuing as the Regional Administrative Director. Although Rowe initially denied that Durham served as Area Business Center Manager, he conceded upon cross-examination that documentary evidence supported Durham's assertion. Durham further testified, and documents supported, that when the reorganization formally went into effect, his promised position—retitled Division Manager—was given to Lawrence Kramb who was 34 years old. Rowe testified that Kramb, who was from the WCC's Industrial Division, possessed certain skills that made him more qualified than Durham, who was from the Inventory Division. Rowe had to concede upon cross-examination, however, that Edgar Middlebrooks, who was Kramb's counterpart in Tampa, Florida, was from the supposedly inept Inventory Division.

---

**9.** We disagree with the dissent that because Lockhart was terminated prior to the release of the McKinsey report's recommendations, there is no basis for Lockhart's allegations that he was discharged pursuant to a "plan, pattern or practice" of age discrimination. The McKinsey Report merely represented a step in the restructuring process. Lockhart alleged in his EEOC charge that WCC was already undergoing a corporate restructuring wherein several branch offices were being consolidated into the Pittsburgh office, and that the resulting new management position would be filled by Gerry

Whitson, approximate age 34, who had less experience than Lockhart. App. at 1503. WCC conceded in its answer to the charge that it was *"in the process of restructuring,* which [would] result in the consolidation of several locations," app. at 1282, and that Mr. Whitson would be in charge of the resulting Pittsburgh Business Center. *Id.* Based upon this evidence, a jury could reasonably conclude that the corporate focus on releasing older employees began essentially with WCC's commissioning of the McKinsey Group, and not when the McKinsey report was released, as the dissent suggests.

Based upon our review of the record, we conclude that Durham proffered sufficient evidence from which a jury could rationally conclude that WCC's purported justification for his dismissal was pretextual, and thus that age was the determinative factor in Durham's termination.

### B.

WCC alleges various pre-trial and trial errors that it contends warrant a trial *de novo* in both Lockhart's and Durham's case. WCC argues that the district court erred in (1) requiring it to defend four separate and distinct age discrimination cases in one jury trial because of an erroneous interpretation of the "opt-in" plaintiff rule under § 16(b) of the FLSA; (2) permitting the testimony of non-party witnesses with regard to the facts and circumstances of their dismissals from WCC's employment; (3) allowing French to testify as to age-related comments made by Barbour, and then striking relevant cross-examination; and (4) instructing the jury that proof of the elements of a prima facie case established a presumption that WCC violated the ADEA. We review the district court's denial of WCC's motion for a trial *de novo* for abuse of discretion. *Honeywell, Inc. v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 655 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989).

### 1. *The "Opt–In" Plaintiffs*

The availability of an opt-in class action suit in this case was governed by 29 U.S.C. § 216(b) (1982), which provides in relevant part that

> [a]n action to recover [for damages resulting from age discrimination] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

29 U.S.C. § 216(b) (1982).

WCC asserts that the district court's interpretation of the opt-in plaintiff rule under § 216(b) was in error. Its first conten-

tion is that summary judgment should have been granted against all additional plaintiffs since they were not "similarly situated" to Lockhart within the meaning of § 216(b). Its second contention is that summary judgment should have been granted specifically against Wilson and Bradley since they did not file charges with the EEOC and Lockhart's EEOC charge did not provide notice of class-based discrimination. As a result of the court's error, WCC avers that it was unduly prejudiced in its ability to defend against the plaintiffs' claims.

In making the argument that the additional plaintiffs were not similarly situated to Lockhart for purposes of joinder under § 216(b), WCC principally relies upon the district courts' opinions in *Plummer v. General Electric Co.*, 93 F.R.D. 311 (E.D. Pa.1981), and *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987), *vacated in part and appeal dismissed sub nom. Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir.1988). We conclude, however, that the district court's reasoning in the case at bar is in accordance with the rationales underlying both the holdings in *Plummer* and *Lusardi*.

In *Plummer*, the court reasoned that four additional plaintiffs were similarly situated to the original complainant based on the following three-pronged test: they were all (1) employed in the same corporate department, division and location; (2) advanced similar claims of age discrimination; and (3) sought substantially the same form of relief. 93 F.R.D. at 312. The court held that "[w]hile these five individuals do not present identical factual assertions, consolidation of their claims into a single representative action would ... provide an efficient procedure for litigating these related claims." *Id.* The same analysis underscores the court's opinion in *Lusardi*. In that case, the court noted that, although there was a common theory of recovery, the claims of the class representatives and the Xerox organizations in which they were employed varied substantially from those of the persons seeking to opt into the lawsuit. Accordingly, the court held that join-

der was impermissible under § 216(b). 118 F.R.D. at 377–78.

■ The opt-in plaintiffs in the present action were all former employees within the Financial Services Division of WCC, albeit in different branch locations. They all claimed that they were terminated from their employment positions as a result of a pattern, plan or practice of willful age discrimination that was conducted by WCC. Moreover, they all claimed the same relief in the form of employment reinstatement, lost wages, liquidated damages and attorneys fees and costs. Balancing the factors as applied in *Plummer* and *Lusardi*, we conclude that all the opt-in plaintiffs in this present action were "similarly situated" to Lockhart.[10]

Contrary to WCC's contention, the fact that it asserted separate defenses with respect to each plaintiff does not vitiate automatically § 16(b) joinder. While the potential for problems with respect to class management may arise from the assertion of individualized defenses, a district court has the discretion to determine whether such problems would make manageability of the class impossible. *Cf. Lusardi*, 855 F.2d at 1074–75 ("Whether a class action is inappropriate ... because of the disparate individual defenses ... [is] entrusted to the district court's sound discretion."). Under the facts of this case, we find that the court did not abuse its discretion since WCC's assertion of separate defenses would not overly burden a class consisting of five plaintiffs.

■ Turning to WCC's second contention, we find that the district court did err in not granting summary judgment against

Bradley and Wilson. Under § 7(d) of the ADEA, a complainant must file a timely charge of discrimination with the EEOC and the appropriate state deferral agency. 29 U.S.C. § 626(d) (1982). Ordinarily, a complainant who fails to file a timely charge is barred from seeking relief. *Bihler v. Singer Co.*, 710 F.2d 96, 97 (3d Cir. 1983); *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 191 (3d Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed. 2d 113 (1978). However, § 16(b) permits opt-in plaintiffs who did not file charges to "piggyback" on the timely charge filed by the original complainant.

■ The district court adopted the least restrictive view of § 16(b) in deciding whether Bradley, Wilson and Lowery could opt into the suit. Following the decision in *Pandis v. Sikorsky Aircraft, Div. of United Technologies Corp.*, 431 F.Supp. 793, 796–98 (D.Conn.1977), the court held that Bradley and Wilson could remain in the suit, even though Lockhart's EEOC charge did not state that it was brought on behalf of others similarly situated, since they could have filed timely charges with the EEOC at the time Lockhart filed his charge. The court, however, ruled that Lowery could not remain in the suit because his own charge would have been time-barred at the time Lockhart filed EEOC his charge.

Subsequent to the district court's denial of WCC's post-trial motions, this Court adopted a narrower interpretation of § 16(b) in *Lusardi*. There we ruled that plaintiffs who had not filed charges with the EEOC could opt into an ADEA class action suit only if the original complain-

---

10. The dissent suggests that we have misread the "similarity requirements" of *Plummer* because the plaintiffs in this case were from "different divisions," had "different managers," and were from "different areas of the country." Dis. op. at 61. Contrary to the dissent's reading of the record, however, the plaintiffs were all employed in the Eastern Zone of the Financial Services Division of WCC, and were all under the supervision of the Eastern Zone Manager, Albert Rowe. App. at 1508. Moreover, contrary to the dissent's understanding of *Plummer*, the district court's finding in that case that five plaintiffs were "similarly situated" under the

meaning of § 216(b) did not rest upon the fact that they "worked in the same department, the same division and in the same location." Dis. op. at 61. Just as critical to the court's decision was its findings that the plaintiffs "advance[d] similar claims of age-based discrimination," 93 F.R.D. at 312, and "[sought] substantially the same form of relief under the ADEA." *Id.* Upon our balancing of the factors outlined in *Plummer*, we find there is sufficient homogeneity among plaintiffs in the case at bar to support the district court's conclusion that the plaintiffs were "similarly situated" for purposes of § 216(b) joinder.

ant's EEOC charge gave the employer notice of class-based age discrimination. 855 F.2d at 1077–78. We noted that although the original complainant's charge did not have to state specifically that it was being brought on behalf of "others similarly situated," the charge must "notif[y] [the employer] that it allegedly discriminates against persons over forty years old as a class." *Id.* at 1078.

■ In contrast, Lockhart's EEOC charge merely stated that WCC terminated *his* position of employment on the basis of his age. Lockhart's charge provided WCC with neither explicit nor implicit notice of alleged of class-based discrimination. Thus, the district court erred in permitting Bradley and Wilson to join in the suit.[11] The court correctly refused Lowery's joinder, but for the reasons we have explained.

■ WCC avers that despite the jury's verdicts against Wilson and Bradley, the district court's improper joinder of them unfairly prejudiced its defense against Lockhart's and Durham's claims. WCC contends that the plaintiffs' cumulative testimonies prejudiced the jury's verdict; that juries have a tendency to reach "compromise verdicts" in multi-plaintiff cases; and that individual plaintiffs were able to take advantage of evidence and testimony that would have been inadmissible if they had brought their own separate suits. Our standard of review of a district court's nonconstitutional error in a civil suit requires that we find such error harmless only if it is highly probable that the error did not affect the outcome of the case. *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 917 (3d Cir.1985). Upon our review of the record, we find that the error of the trial court in this case was harmless.

■ WCC first claims that it was unfairly prejudiced by the cumulative effect of the co-plaintiffs' testimonies. As support for this contention, WCC notes that case law under the ADEA holds that the testimony of non-party witnesses about the circumstances surrounding their discharge from employment is irrelevant or, if relevant, its probative value is outweighed by undue prejudice. *Moorhouse v. Boeing Co.,* 501 F.Supp. 390, 392–93 (E.D.Pa.), *aff'd,* 639 F.2d 774 (3d Cir.1980). WCC submits that although such testimony came from co-plaintiffs in this case, it is no less prejudicial, presumably because Wilson and Bradley were improperly joined.

What we find lacking in both WCC's argument and the dissent's analysis of this issue is an understanding that Wilson and Bradley were not brought into this suit to buttress Lockhart's and Durham's claims, but to testify in support of their own claims of age-based discrimination. The dissent, nevertheless, asserts that "[w]hen numerous plaintiffs all level the same discrimination charge against the employer, a 'spillover effect' on the jury is inevitable." Dis. op. at 62. To hold, as the dissent suggests, that this case should be remanded because improperly joined plaintiffs testified as to the circumstances of their discharges, would be to create a basis for reversing *every* case on the speculative assertion that testimony of improperly joined plaintiffs "spilled over" into the jury's findings of discrimination with respect to those plaintiffs properly joined. We hesitate to adopt such a far-reaching rule, especially where, as here, the testimony and proffered evidence of the improperly joined plaintiffs was insufficient to support a jury's verdict in their favor.

---

**11.** The district court also erred in holding that the joinder of Bradley and Wilson was sanctioned by the permissive joinder rule of Fed.R. Civ.Pro. 20(a). In *Lusardi,* we recognized that opt-in class action suits had been analogized to permissive joinder and intervention, but rejected such comparisons since

[t]o view opt-in suits under § 16(b) as either permissive joinders or efforts to intervene would necessarily require that the plaintiff individually fulfill all of the prerequisites to suit. However, it makes little sense to permit

the opt-in class action to be started by a few and later joined by many if individual requirements of exhaustion of remedies can defeat the individual claims of those who opt-in, but have not individually met administrative filing requirements.

855 F.2d at 1078. Moreover, we note that Bradley and Wilson could not have been joined pursuant to Fed.R.Civ.P. 20(a), in any event, since neither one had fulfilled the administrative requirement of filing his own timely charge with the EEOC.

WCC next argues that in multi-plaintiff litigation, juries have a "natural tendency" to reach "compromise verdicts," in which they find partially in favor of both the plaintiff and defendant. Since the plaintiffs were improperly joined, WCC contends that it was unduly prejudiced by the likelihood of this jury phenomenon. WCC offers, however, no cases to support its novel contention and concedes that "it cannot be known whether any compromise was reached by the jury." Brief for Appellant at 31. Nevertheless, WCC asserts that it cannot be said with fair assurance that such a compromise did not occur, and thus it is entitled to a new trial. We disagree for the same reasons that we cannot join the dissent's opinion that a "spillover effect" occurs in multi-plaintiff ADEA actions. Our task on review is to ascertain only whether the jury's verdict is reasonable in light of the evidence presented, and not to indulge in unsubstantiated and speculative assertions. On the record of this case, we are satisfied the jury's verdicts were reasonable.

Lastly, WCC argues that the district court's error in joining parties permitted the inclusion of evidence and testimony that would not have been otherwise available to each plaintiff individually. WCC's principal contention on this point concerns Lockhart's use of an age-related comment made in January 1984 by Robert Barbour, who was at that time Senior Vice–President of WCC's Commercial Services. At trial, Donald French, a former WCC employee, testified that Barbour had told him that "Westinghouse Credit was a seniority driven company with old management and that's going to change, 'I'm going to change that.'" App. at 628. WCC asserts that since Barbour was not associated with the Financial Services division until after Lockhart's termination, his statement was irrelevant with respect to Lockhart's discharge and thus would have been inadmissible in Lockhart's individual case. We disagree.

WCC ignores the fact that prior to and at the time of Lockhart's termination, Barbour was already an individual at the top of WCC's managerial hierarchy as Vice–President of Industrial Equipment Financing, one of WCC's four corporate divisions. While there is no direct evidence that Barbour made similar statements prior to the time when Lockhart was terminated, it would be reasonable for the jury to conclude that his statement of January 1984 was not a recent managerial viewpoint, but that it was merely a cumulative statement of managerial policies that had been sanctioned or favored by top executives at WCC for a considerable time. It would have been reasonable for the jury to believe that the Vice President of Industrial Equipment Financing held a position of sufficient breadth that he was either involved in the policies at issue, or had been advised by other executives of WCC's hostility towards "a seniority driven company with old management." When a major company executive speaks, "everybody listens" in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman. *Compare Miles v. M.N.C. Corp.*, 750 F.2d 867, 875 (11th Cir.1985) (racial slur made by official closely involved in the company's hiring decisions held admissible); *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir.1982) (managers' statements that company's new employment policy was designed to replace its older workers held admissible); *with Staheli v. Univ. of Mississippi*, 854 F.2d 121, 127 (5th Cir.1988) (statement made by person having no authority over denial of plaintiff's tenure held inadmissible); *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983) (comments made by managers not involved in decision to discharge plaintiff held inadmissible).

2. *Testimony of Non–Party Witnesses*

WCC submits that it was unduly prejudiced by testimony from Roy Owens and Donald French, former employees of WCC who testified about the circumstances of their release in addition to statements made by WCC executives, and that *Moor-*

*house* dictates a new trial. We find, however, that the facts of that case are distinguishable from the present action. In *Moorhouse,* the district court held that former employees who were plaintiffs in other lawsuits could not primarily testify about circumstances surrounding their own discharges in order to help the plaintiff prove a pattern or practice of discrimination. The court noted:

> With the exception of testimony concerning comments about age generally, the adequacy of Moorhouse's work performance and Boeing's transfer in lieu of the lay off practice, the testimony was drawn from each plaintiff/witnesses' knowledge of the circumstances surrounding his *own* lay off, which ultimately led to the witnesses' suit against Boeing.

501 F.Supp. at 392 (emphasis in original). In the present action, neither Owens nor French alleged that he was terminated on account of a pattern, plan or practice of age discrimination.[12] After providing some background information on their employment histories, they chiefly testified about comments made by WCC executives.

3. *French's Testimony and Cross-Examination*

▉▉▉ WCC argues that the district court erred in permitting French to testify about Barbour's age-discriminatory statement, and then compounding the error by striking WCC's relevant cross-examination. We have already held that Barbour's statements were relevant to Lockhart's charge of age discrimination. Therefore, we focus our inquiry on WCC's contention that the district court struck relevant cross-examination.

Upon our review of the record, we are convinced that the district court fully allowed WCC's counsel to use French's pretrial deposition to attack his credibility during the cross-examination. The court only limited both plaintiffs' and WCC's counsel from addressing any "fear" that French

may have had for his own job as a result of Barbour's statement. During the direct examination, the district court properly limited French's testimony as follows:

Q. Well, what, if anything, did Mr. Barbour say to you at the luncheon?

A. Mr. Barbour said that Westinghouse Credit was a seniority driven company with old management and that's going to change, "I'm going to change that."

Q. When you heard this, what was your reaction?

A. Well, I guess frightened, concerned.

. . . .

THE COURT: All right. Now I don't want any more testimony along that line whatsoever. That has nothing to do with this case. We're concerned with somebody being discharged because of age.

App. at 628–29.

Similarly, the court imposed the following limitation on WCC's cross examination of French:

Q. Now what was you reaction to that statement? You said you were shocked?

A. Yes.

Q. Why was that?

A. Well, I happened to be a senior person.

. . . .

THE COURT: Now this is all beyond the scope of the direct examination.

App. at 631–32.

WCC's opportunity to attack French's credibility through contradictions in his deposition testimony came *after* the court's exclusion of emotional testimony, and was uninhampered.

Q. In describing that conversation in your deposition testimony, you didn't refer to the words "old management" there, did you?

A. Not the way you read it there now.

Q. Well, do you have any reason— would you like to read to see if I misread it?

12. For example, French in his background testimony stated that on July 13, 1984, Hoover Keith, a Regional Credit Manager, told him that WCC no longer needed him and that he was

being released. When the court inquired whether he was contending that he was discharged on the basis of his age, French responded negatively. App. at 626–27.

A. No.

App. at 632–33.

We conclude that the court did not abuse its discretion in limiting irrelevant and highly prejudicial emotional testimony into the record. *Cf. Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984) (plaintiff could not testify as to emotional effect of being discharged since such testimony was irrelevant and prejudicial). Moreover, we conclude that the court provided WCC with a full and fair opportunity to discredit French's testimony through use of his pretrial deposition.

### 4. *The Jury Instructions*

 WCC avers that the district court committed reversible error by instructing the jury that proof of the elements of a *prima facie* case establishes a presumption that WCC violated the ADEA. As we noted earlier, a defendant's articulation of a legitimate nondiscriminatory reason for its conduct rebuts the presumption formed by the plaintiff's establishment of a *prima facie* case of age discrimination. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Therefore, it can be reversible error for a trial court to instruct a jury on a presumption after the defendant has met its burden of proof necessary to rebut that presumption. *Psaty v. United States*, 442 F.2d 1154, 1161–62 (3d Cir.1971).

 WCC argues that the district court judge committed prejudicial error when he informed the jury: "In a moment I will tell you what [each] plaintiff must

prove in order to establish a presumption that the defendant violated the Age Discrimination in Employment Act." App. at 1204. Although the judge clearly erred in mentioning the presumption after WCC had already brought forth substantial evidence to rebut it, that error was not prejudicial. Upon review of the entire charge to the jury,[13] the initial and solitary use of the term "presumption" was offset by the district court's repeated explanation to the jury that it had to find by a preponderance of evidence that age was the determinative factor in WCC's discharge of the plaintiffs, and that the plaintiffs had to bear individually their burden of persuasion.[14]

In *Psaty*, "[w]e d[id] not decide that an instruction to a jury on [a] presumption ... is reversible error in every case." 442 F.2d at 1162. The "recurring instructions on the presumption in th[at] case, however, were bound to give the jury the impression that the presumption was evidence." *Id.* In the present case, the exact opposite happened. The district court repeatedly explained that the plaintiffs had to meet individually their persuasion burdens by a preponderance of the evidence. Significantly, a fatal flaw in *Psaty* was that the court "failed to furnish guidance to the jury as to the amount or quantity of proof required to dispel the presumption." *Id.* In the instant case, the court explained that WCC "need[ed] only [to] produce enough evidence in support of [its] claim to create a genuine issue of fact" in the jurors' minds to rebut the presumption. App. at 1206.

---

**13.** Jury instructions must be evaluated as a whole and not piecemeal. *Ayoub v. Spencer*, 550 F.2d 164, 168 (3d Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977).

**14.** The district court in its charge to the jury correctly stated:

> You must remember that as a general matter the plaintiff bears the burden of proof by a preponderance of the evidence that the defendant intentionally discriminated against him on the basis of his age.
>
> .　　.　　.　　.　　.
>
> If a plaintiff persuades you by a preponderance of the evidence that the defendants discharged him because of his age, then you must consider the defendant's defense that its

action was based upon reasonable factors other than age.

> .　　.　　.　　.　　.
>
> If the defendant satisfies its burden of production by proffering evidence tending to show a non-discriminatory reason for the challenged action, then each plaintiff must persuade you by a preponderance of the evidence that the reasons articulated by the defendant for the discharge or layoff are but a mere pretext or a coverup for what was in truth a discriminatory purpose or that a discriminatory reason more likely motivated the employer. Should the plaintiff so persuade you, you must find that the defendant violated the ADEA.

App. at 1205–07.

■ Viewing the jury's instructions as a whole, we conclude that the jurors were properly apprised of who had the burden of proof and what quantum of evidence was needed for persuasion.[15] *Cf. Dreyer v. Arco Chemical Co., Div. of Atl. Richfield Co.*, 801 F.2d 651, 653 n. 2 (3d Cir.1986) (no reversible error since "the district court specifically and repeatedly instructed the jury that it must find that age was a determinative factor in the plaintiffs discharge"), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987); *Mitroff v. Xomox Corp.*, 797 F.2d 271, 278 (6th Cir.1986) (instruction as a whole was proper since the court twice stated that burden of proof was on the plaintiff).

■ While we have recognized that there were multiple trial errors in this case, we cannot join the dissent in holding that multitude of error alone is sufficient ground for reversal. The Federal Rules require that a "court *at every stage* of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61 (emphasis added). Since we find *each* error harmless, there is no basis for concluding that WCC's substantial rights were violated. Therefore, we hold that the district court did not abuse its discretion in denying WCC's motion for a new trial.

### C.

WCC's final contention is that insufficient evidence exists on the record to warrant the jury's finding of a willful violation under the ADEA and, therefore, that Durham should not have been awarded liqui-

dated damages.[16] We must affirm the district court's denial of WCC's motion for a judgment n.o.v. on the willfulness issue "unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918, 921 (3d Cir. 1986) (citation omitted); *see also Kinnel v. Mid–Atlantic Mausoleums, Inc.*, 850 F.2d 958, 961 (3d Cir.1988).

Our analysis of the willfulness issue is guided by this Court's decision in *Dreyer*, 801 F.2d at 656–58, where we set forth a standard for determining willfulness in the context of individual employment terminations that we believe comports with the standard set by the Supreme Court in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125–30, 105 S.Ct. 613, 623–26, 83 L.Ed.2d 523 (1985); *accord McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). We noted that the *Thurston* standard of determining willfulness—if an employer either knew or showed reckless disregard for the matter of whether its conduct violated the ADEA—was apt for those situations where the employer adopts a policy that violates the ADEA.[17] We concluded, however, that the application of the *Thurston* standard to cases alleging disparate treatment in an individual employment context would produce the undesirable effect of permitting the recovery of liquidated damages whenever there was a violation of the ADEA. *Dreyer*, 801 F.2d at 656–57; *accord Anastasio*, 838 F.2d at 707.

Keeping with the rationale of *Thurston*, we therefore concluded that, in cases in-

---

**15.** The dissent take issue with the fact that the district court did not instruct the jury that it had to find separately a plan, pattern or practice of age discrimination. We disagree that such a determination was "an essential jury finding." Dis. op. at 63. In our view, it was sufficient for the court to instruct the jury that it had to find that WCC terminated each plaintiff in violation of the ADEA. In reaching that finding, the jury was properly apprised of who had the burden of proof and the amount of evidence necessary for persuasion.

**16.** The ADEA provides that "liquidated damages shall be payable only in cases of willful viola-

tions." 29 U.S.C. § 626(b) (1982). The ADEA qualifies liquidated damages, by reference to the FLSA, as an amount equal to the losses sustained in lost wages and other benefits. *See* 29 U.S.C. §§ 216(b), 626(b) (1982).

**17.** For example, in *EEOC v. Westinghouse Electric Corp.*, 869 F.2d 696 (3d Cir. 1988), we applied the *Thurston* standard to determine whether corporate pension and severance pay plans for retirement-eligible employees were in willful violation of the ADEA.

volving an employer's conduct against an individual employee, a finding of a willful violation of the ADEA had to be supported by evidence of *outrageous* conduct that was not merely duplicative of that evidence needed for awarding compensatory damages. *Dreyer,* 801 F.2d at 658. We noted that liquidated damages might be justified where there is evidence of systematic purging of older employees; discharging an employee at a time that would deny him an imminent pension; and an employer's previous violation of the ADEA. *Id.* We admonished, however, that there was no set prescription for what constitutes conduct warranting liquidated damages, and that "the appropriateness of the award [was] dependent upon an ad hoc inquiry into the particular circumstances." *Id.* The Restatement suggests that in conducting that inquiry, "the trier of fact can properly consider the character of the defendant's act, [and] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause." *See* Restatement (Second) of Torts § 908(2).

■ Durham asserts that the evidence of WCC's outrageous conduct in terminating him is found in the fact that he put an overwhelming amount of extra work hours into planning the Atlanta Area Business Center that he operated until his termination; that WCC asked him to work for one month after being notified of his discharge in order to train his reputed replacement; that his termination occurred when he was under a contract to buy a new house that he was forced to purchase while jobless; and that his immediate supervisor never told him the reason for his discharge.

We find that this proffered evidence falls short of that "minimum quantum" needed to support the jury's finding of willful discrimination. With respect to the character of WCC's actions, its discharge of Durham

after he established the Atlanta Area Business Center was not outrageous since Durham was not coerced into this project or exploited in any other manner. To the contrary, the record establishes that Durham voluntarily assumed the additional duties, and that WCC gave him a monetary incentive award in appreciation. Moreover, under the facts of this case, WCC's conduct was not egregious in requesting that Durham familiarize Johnson with the aspects of his employment position before leaving. If WCC had asked Durham to train Kramb, who Durham contends actually replaced him, the willfulness issue would be a much closer call.[18] Finally, we note that although Durham claims that he was not told the reason for his discharge, the record shows that he was told that he was being terminated because of WCC's reorganization. The fact that Durham's direct supervisor refused to elaborate further as to why no position would be available for him after WCC's restructuring is not evidence of outrageous conduct.

■ Having examined the character of WCC's actions, we must now address the nature and extent of the harm caused to Durham. Such harm must extend beyond that normally associated with an employee's discharge resulting from age discrimination; the injury must have been compounded by the employer's conduct in order to warrant an award of liquidated damages. We conclude that although Durham's unlawful termination coincided with his purchase of a new home, that misfortune alone cannot be the basis for awarding of double damages. If we were to hold otherwise, then every plaintiff in an age discrimination case who was in considerable debt at the time of their termination would be able to receive punitive damages.[19]

---

18. A jury might rationally find evidence of outrageous behavior if an employer requested that an older employee train a young, inexperienced person for his job prior to involuntary termination.

19. We are perplexed at the dissent's conclusion that insufficient evidence proffered by Durham to prove wilfulness prejudiced WCC's substan-

tial rights. Evidence of willfulness, when pled, is often introduced in ADEA suits and there is no inherent harm done by this practice since the jury only reaches the willfulness issue *after* it has made a finding of age discrimination. If we were to hold as the dissent encourages, every multi-plaintiff ADEA suit would have to be bifurcated into two separate trials—the first one to establish a violation of the ADEA, and the

### III.

For the foregoing reasons, we will affirm the district court's order denying WCC's motion for judgment notwithstanding the verdict and, alternatively, for a new trial insofar as it upholds the jury's finding of liability to Lockhart and Durham. We will reverse the court's order insofar as it upholds the jury's finding that WCC acted willfully in discharging Durham. Accordingly, we will vacate that portion of the district court's judgment order awarding Durham liquidated damages.

GARTH, Circuit Judge, dissenting:

Apart from the conclusion which it reaches—the majority *affirms* the jury verdict in favor of the plaintiff—I would *reverse* that judgment—the majority analysis does not differ substantially from mine.

The majority agrees with me that this action could not be maintained by plaintiffs Wilson and Bradley, by reason of their failure to file timely charges with the EEOC pursuant to 29 U.S.C. § 626(d). Maj. op. at 53. It also agrees with me that joinder of these plaintiffs was improper under § 16(b) of the Fair Labor Standards Act ("FLSA"), maj. op. at 53–54, and that joinder was also improper under Fed. R.Civ.P. 20(a). Maj. op. at 53 n. 11.

The majority, as do I, concludes that Judge Teitelbaum erred when he instructed the jury "[i]n a moment I will tell you what [each] plaintiff must prove in order to establish a *presumption* that the defendant violated the Age Discrimination in Employment Act." Maj. op. at 56 (citing A. 1204) (emphasis added).

Finally, the majority agrees with me that the district court erred in refusing to grant Westinghouse's motion for a directed ver-

dict or a judgment notwithstanding the verdict on the issue of willfulness because the record contains utterly no evidence establishing willfulness. Maj. op. at 59.

Given this litany of error, which all members of the panel are unanimous in recognizing, and given our standard of reviewing such error, i.e. that error is harmless only if it is *highly probable*[1] that the error *did not affect* the outcome of the case, *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 917 (3d Cir.1985), I cannot understand how the majority can hold these erroneous rulings, individually but particularly in combination, to be harmless.

Moreover, the majority does not discuss, and therefore its position is unknown, regarding the focal point of Westinghouse's defense—the McKinsey Report. This Report was the predicate for the plaintiffs' theory that Westinghouse subscribed to a plan calling for the elimination of its older middle management employees. Westinghouse argued that Lockhart and Bradley could not have been discharged as a result of the McKinsey Report because the Report was filed long after they were discharged.[2] Westinghouse also pointed out that with respect to the other plaintiffs, only Durham could have been affected by the principal recommendation of the Report—the consolidation of the financial services and industrial equipment groups—and that "affect" had nothing to do with Durham's age. The majority opinion simply does not address these contentions as they bear upon the issues on appeal.

Furthermore, the majority opinion blithely dismisses Westinghouse's complaints about the actions taken by Judge Teitelbaum in limiting Westinghouse's cross-examination of the plaintiffs' principal wit-

---

second one to examine whether such violation was willful—to guarantee that proffered evidence of willfulness could not "have infected and tainted the record with respect to all other issues." Dis. op. at 63. Moreover, we note that the dissent's contention that the district court's instruction on willfulness was impermissible is beyond the parameters of our review, since the court's instruction has not been challenged on appeal.

**1.** High probability requires that the court have a *sure* conviction that the error did not prejudice the defendant. *United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986). In the context of non-constitutional harmless error, the civil and criminal standards of review are no different. *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 927 (3d Cir.1985).

**2.** I discuss the McKinsey Report with respect to Wilson and Durham, *infra*.

ness, Donald French. French's testimony was the most damaging piece of evidence presented by the plaintiffs against Westinghouse. The record is extremely murky regarding the district court's restriction of Westinghouse's cross-examination. Thus, the majority's position is highly questionable when it holds that the limitation of French's cross-examination applied only to irrelevant testimony.

With this many critical and substantive errors pervading the entire course of this case, I cannot say that Westinghouse had a fair trial. Certainly, I could not hold that Westinghouse had received substantial justice, because it is clear to me, as I would have hoped it would be clear to the other panel members, that these errors affected Westinghouse's substantial rights. *See* Fed.R.Civ.P. 61.[3] Moreover, in light of these errors, particularly the misjoinder of plaintiffs, the majority of this panel cannot have a *sure* conviction that the errors which they have identified, did not prejudice Westinghouse. *See United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986). In my opinion, the judgment in favor of Lockhart and Durham must be reversed. I dissent.

## I.

Perhaps the most critical error made by the district court, and recognized here by the entire panel, was the district court's ruling which permitted over Westinghouse's strenuous objection, three other individuals to be joined in this suit: Messrs. Bradley, Wilson and Durham. Two of these three (Bradley and Wilson) had failed to file timely charges with the EEOC. The district court nevertheless permitted all three to be joined holding that they were "similarly situated," and that thus joinder could be effected under FLSA § 16(b), 29 U.S.C. § 216(b). Alternatively, the district

court held that Federal Rule of Civil Procedure 20(a) sanctioned such permissive joinder. The district court erred in each of these rulings and those errors have been pointed out in the majority opinion. Maj. op. at 53, 53–54, 57, 59.

First and foremost, the majority agrees with me that a decision of this court, binding on the district courts, is directly contrary to the FLSA § 16(b) ruling made in this case. *Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir.1988), unequivocally establishes the principle that the failure of plaintiffs seeking joinder to file a timely charge with the EEOC bars the joinder of those plaintiffs, absent classwide charges in the EEOC filing of the named plaintiff (in this case Lockhart). That is the precise situation in this case. Indeed, every circuit that had considered this question even before our *Lusardi* decision had been filed, reached the same conclusion. *See Kloos v. Carter Day Co.*, 799 F.2d 397, 402 (8th Cir.1986); *Naton v. Bank of California*, 649 F.2d 691 (9th Cir.1981); *Mistretta v. Sandia Corp.*, 639 F.2d 588, 594–5 (10th Cir.1980); *McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 755–56 (5th Cir.1980). Not only was joinder improper under § 16(b), but it was not available under Fed.R.Civ.P. 20(a), as the district court ruled.

Fed.R.Civ.P. 20(a) permits joinder if the plaintiffs assert rights arising out of the same transaction and if any question of law or fact common to all plaintiffs will arise in the action. However, as the majority opinion properly holds (Maj. op. at 53, n. 11), neither Bradley nor Wilson could have been joined pursuant to this Rule since neither had fulfilled the administrative requirement of filing a timely charge with the EEOC.

Moreover, even if *Lusardi* was not the law in this circuit, the district court's joinder of the additional plaintiffs could not be

---

**3.** Federal Rule of Civil Procedure 61, "Harmless Error" provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modify-

ing or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with *substantial justice.* The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the *substantial rights* of the parties. (Emphasis added.)

sustained. The majority opinion discusses and finds favor with *Plummer v. General Electric*, 93 F.R.D. 311 (E.D.Pa.1981). I suggest, however, that the majority has misread that case. The majority opinion has attempted to equate the situation in the present case with the situation presented in *Plummer*, although it acknowledges that because of the failure of the additional plaintiffs here to file timely charges with the EEOC, joinder could not have been permitted even under *Plummer*.[4]

In *Plummer*, the district court was confronted with a motion to permit nine plaintiffs to join the *Plummer* action. The district court allowed the joinder of five ADEA plaintiffs all of whom worked in the same department, the same division and in the same location. However, the district court refused to allow the joinder of four other ADEA plaintiffs who were former employees of General Electric but who worked in various other departments and divisions. The district court in *Plummer* noted: (1) that because they were in various departments and divisions it was difficult to see how the named plaintiff, Plummer, would adequately represent the other defendants; and (2) the defenses raised by General Electric would turn on the particular employment decisions of particular and different managers. *Plummer*, 93 F.R.D. at 312.

The circumstances of the additional plaintiffs in the present case are more nearly identical to the plaintiffs who were *denied* joinder in the district court in *Plummer*. Here, the plaintiffs are all from different divisions of the company.[5] They each reported to different managers and they were all from different areas of the coun-

try. Indeed, Lockhart worked in Pittsburgh, Pennsylvania; Durham in Atlanta, Georgia; Wilson in Jacksonville, Florida; and Bradley in Livonia, Michigan. While Lockhart and Bradley were discharged by the same regional manager, Durham and Wilson were each discharged by a different individual. Thus, while Durham filed a timely charge with EEOC, he nevertheless did not satisfy the "similarity" requirements of FLSA § 16(b) even as construed by *Plummer*. Accordingly, the district court should not have permitted Durham to join Lockhart's action.

Despite these divergent circumstances, the plaintiffs argue that they were properly joined by a common bond as victims of the McKinsey Report. This was a Report prepared by a management consulting firm which recommended the consolidation of two divisions within Westinghouse. This argument simply does not fly. McKinsey was hired to investigate management at Westinghouse in May 1983. (A. 667). Lockhart was discharged on May 3, 1983 and Bradley on June 28, 1983, well before McKinsey had finished its inquiries and report. (A. 669–70). The consolidation of the financial services group and the industrial equipment group, the principal recommendation of the McKinsey Report, occurred in *January 1984*. Wilson was terminated almost a year later on December 4, 1984. Westinghouse concedes that Durham was let go as a result of the recommendations of the McKinsey Report, but not because of his age. As I have just pointed out, however, Durham was improperly joined.

The majority opinion, at footnote 9, attempts to explain the relevance of the

---

**4.** Significantly, the district court in *Plummer* did not expressly address the issue of EEOC filing. I assume, however, that all the putative *Plummer* plaintiffs had satisfied the EEOC filing requirement, because the *Plummer* Court specifically cited to *Burgett v. Cudahy Co.*, 361 F.Supp. 617, 622 (D.Kan.1973), which was a case concerned with the necessity of a timely EEOC filing.

**5.** The majority opinion, p. 52 n. 10, is of the view that because the plaintiffs were all part of the "Eastern Zone of the Financial Services Division" and because they all sued for damages

for age discrimination, that they were "similarly situated" as defined by *Plummer*. The fact that the plaintiffs were "all under the supervision of the Eastern Zone Manager" has little bearing on the "similarly situated" requirement defined in *Plummer*. The "Eastern Zone" of Westinghouse Credit Corporation which embraces virtually one-half of the continent, is a far cry, in terms of similarity, from the Space Systems Division of General Electric which employed all of the joined plaintiffs in *Plummer*, in one plant. *See* 93 F.R.D. at 312.

McKinsey Report to Lockhart's discharge even though Lockhart was terminated months before the report was finished and filed. Nevertheless, the majority opinion claims that because Westinghouse was undergoing some corporate restructuring prior to the authorization of the McKinsey Report, a jury could conclude that Westinghouse's policy of terminating older employees was independent of the McKinsey Report's ultimate recommendations. Maj. op. at 50 n. 9. First, the record does not reveal how the consolidation of several branch offices into the Pittsburgh office can establish a nationwide plan or practice of discrimination such as the one alleged by the plaintiffs here. Second, nowhere does Lockhart charge that the consolidation which occurred in Pittsburgh, marked the beginning of the company's allegedly discriminatory policy. Instead, as I have pointed out, Lockhart himself relies exclusively, on the McKinsey Report as the triggering event for his discharge.

Not only does the simple fact of timing rebut the plaintiffs' argument that they were all victims of the McKinsey Report, but Westinghouse offered individualized explanations for the terminations of Lockhart, Bradley and Wilson. Lockhart was fired as a result of a problematic audit of his areas of responsibility. Wilson was dismissed for poor sales performance. Bradley was laid off when two district offices were combined into one statewide office—a consolidation which took place in June, 1983. The plaintiffs do not point to any evidence in the record which indicates that this consolidation resulted from the McKinsey recommendations.

It is true that this court's *Lusardi* decision to which I have earlier adverted, was filed after the district court erroneously permitted joinder in this case. However, in my view, the district court's ruling and the consequences to which it led, i.e. the testimony of party witnesses, who, absent the improper joinder, could not have testified to the circumstances of their dismissal, constituted, without more, reversible error. When linked with the other errors which we have all acknowledged, and which I have listed at the outset of this dissent, I can only conclude that the majority has failed to appreciate the injustice these rulings have dealt to the defendant. More importantly, the majority in affirming the verdict has departed from our established *McQueeney* and *Grayson* standard of review by holding such error to be harmless.

## II.

Given the distinct lack of commonality or similarity amongst these plaintiffs, it is clear to me, as I had hoped it would be to the majority, that the district court both erred and abused its discretion in permitting their joinder. Moreover, the error in joining the additional plaintiffs was compounded when their otherwise impermissible testimony was heard by the jury. When numerous plaintiffs all level the same discrimination charge against their employer, a "spillover" effect on the jury is inevitable. It was this "spillover" that severely prejudiced Westinghouse, as any fair reading of the record reveals.

The majority opinion at 53–54, apparently reads my reaction to the joinder of Wilson and Bradley as an assertion on my part that Wilson and Bradley were joined only to buttress the claims of Lockhart and Durham. Nothing could be further from the truth. My point is that Wilson and Bradley should never have been joined as plaintiffs and that their joinder unfairly prejudiced the defendant Westinghouse. This is so, even though Wilson and Bradley may have had legitimate claims of their own to assert. In this regard, I do not lose sight of the fact that: 1) both members of the majority agree with me that the joinder of Wilson and Bradley was improper (*see* maj. op. at 53–54); and 2) despite Wilson and Bradley's "independent" age claims, the jury found against them. Thus, despite the majority opinion's overbroad assertion that my analysis would provide the basis for reversal in every case where plaintiffs were improperly joined, I have advocated reversal here only because of the cumulative errors committed by the district court and the severe prejudice visited upon Westinghouse as a result of the joinder of multi-

ple plaintiffs in this case where the circumstances of each of their discharges were so completely different.

Additionally, the error of the district court was aggravated by its failure, despite Westinghouse's request, to provide the jury with a charge that the jury must find that Westinghouse engaged in a pattern or practice of discrimination as alleged in the amended complaint. Indeed, Westinghouse proffered a specific interrogatory designed to elicit this specific and essential jury finding, and this too was denied. Brief of Westinghouse at 4 n. 1; Reply Brief at 1–2.

Thus, the joinder error of the district court became even more harmful when it was compounded by the district court's failure, despite Westinghouse's request, to charge the jury that it must find that Westinghouse engaged in a pattern or practice of discrimination, or to provide an interrogatory requiring an explicit finding on this issue.[6] Indeed, the fact that the jury found for Westinghouse with respect to Bradley and Wilson,[7] but against Westinghouse as to Lockhart and Durham clearly indicates that the jury did not find a general pattern, plan, or practice of age discrimination.

### III.

Not only were Bradley, Wilson and Durham permitted to testify as party witnesses when they were improperly joined as parties, but in addition, Owens and French, both former Westinghouse employees were permitted to relate to the jury the circumstances of their discharges as well. Notwithstanding the majority's analysis on the admissibility of this testimony (an analysis with which I have great reservation) the fact remains that the jury heard the testimony of six individuals all testifying about the individual circumstances of their dismissals, when it should have heard from only one—Lockhart.

### IV.

The district court, ignoring Westinghouse's articulation of a legitimate non-discriminatory reason for its conduct—a reason which served to rebut the presumption accorded a prima facie case, nevertheless charged the jury:

> In a moment I will tell you what [each] plaintiff must prove in order to establish a *presumption* that the defendant violated the Age Discrimination in Employment Act.

(A. 1204) (emphasis added).

The majority concedes that Judge Teitelbaum clearly erred in "mentioning the presumption after Westinghouse had already brought forth substantial evidence to rebut [the] presumption." Maj. op. at 56. However, the majority holds in the face of the numerous acknowledged errors committed by the district court, that this error too, even when added to the other more egregious rulings of the district court, did not prejudice Westinghouse.

### V.

Lastly, the panel was again unanimous in holding that the record did not contain sufficient evidence to warrant the jury's finding of a willful ADEA violation. Thus, not only was Durham improperly joined as a party, but the evidence which the jury heard in support of Durham's contentions of willful violations of the ADEA, had to have infected and tainted the record with respect to all of the issues.

The majority professes to be perplexed by my argument that evidence of willfulness pertaining to an improperly joined party had to have had a prejudicial effect on the entire case. Maj. op. at 58 n. 19. It is evident that I do not advocate the proliferation of trials as the majority suggests

---

**6.** The majority of this court, p. 57 n. 15, apparently disregards the plaintiff's amended complaint which charges, *as to each plaintiff,* that Westinghouse had a "plan, pattern, or practice of unlawful discrimination in which the Defendant conspired to, and willfully did, terminate the plaintiff and other individuals similarly situated to him solely as a result of their age." (Lockhart complaint ¶ 16 (A.39), Wilson ¶ 22 (A.41), Lowery ¶ 30 (A.43), Durham ¶ 38 (A.46), Bradley ¶ 44 (A.48)).

**7.** As Westinghouse argues, even though the jury returned verdicts against both Wilson and Bradley, this error was not harmless. The prejudice to WCC lay in the burden of presenting individualized defenses to four separate claims before one jury, and in the inherent prejudice which is entailed by having the jury hear the circumstances of termination of multiple long-term employees.

that I do. What I do contend is that in *this* case, the cumulative errors committed by the district court rendered this particular trial unfair. Included among those errors was Durham's misjoinder and his testimony (both as to discharge and willfulness) which as a result of his misjoinder, was heard by the jury.

If we consider the district court's instruction on the issue of willfulness—an impermissible instruction because no evidence of willfulness appears in the record—in conjunction with all of the other evidence which should not have been heard had the district court properly ruled on the joinder question, it becomes more than highly probable, to the point of certainty, that individually, and combined, the district court's errors affected the outcome of this case leading to the "sure conviction that the error[s] did" indeed prejudice Westinghouse. *United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986).

### VI.

The most egregious error committed by the district court and the one that infects the entire case was its ruling which allowed the joinder of Wilson, Bradley, and Durham, and therefore the testimony of the additional plaintiffs. This error, in my opinion, so tainted the trial proceedings, that without more, this case must be remanded for a new trial. Unfortunately, however, there is "more."

I have catalogued the other district court errors, almost all of which are admitted by the majority opinion to be erroneous rulings. Given the sheer number of these erroneous rulings which this record presents, and the consequences that flow from them, there can be no question but that the substantial rights of Westinghouse were seriously affected, and substantial justice to Westinghouse was denied. *See* Fed.R.Civ.P. 61.

I therefore respectfully dissent from so much of the majority's opinion which affirms the judgment of the district court.[8] I would vacate the entire district court judgment and remand this case for a new trial.

---

8. As I have stated in text, I join the majority in reversing so much of the district court judgment

SUR PETITION FOR REHEARING

Before GIBBONS, Chief Judge, and HIGGENBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD and GARTH, Circuit Judges.

A. LEON HIGGENBOTHAM, Jr., Circuit Judge.

The petition for rehearing filed by appellant in the above—entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court in banc, is denied. Judge Hutchinson would grant rehearing before the Court in banc. Judge Garth would grant the petition for panel rehearing for all of the reasons expressed in his panel dissent. *See supra*, at 59.

---

as holds that Westinghouse acted willfully in discharging Durham.